# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DARREN JAMES LACOUR,**

**Plaintiff,**

**v.**                                          **No. CIV-14-925 LAM**

**CAROLYN W. COLVIN, Acting Commissioner**
**of the Social Security Administration,**

**Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's *Motion for Reversal and Remand for Further Proceedings (Doc. 21)* and *Supporting Memorandum (Doc. 22),* filed June 29, 2015 (hereinafter "motion").   On September 28, 2015, Defendant filed a response to Plaintiff's motion (*Doc. 26*), and, on October 14, 2015, Plaintiff filed a reply (*Doc. 27*).   In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to the undersigned United States Magistrate Judge to conduct all proceedings and enter a final judgment in this case. *See* [*Docs. 8* and *10*].   The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law.   Additionally, the Court has meticulously reviewed and considered the entire administrative record.   [*Doc. 18*].   For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security (hereinafter "Commissioner") should be **REMANDED**.

# I.   Procedural History

On June 15, 2011, Plaintiff filed an application for Disability Insurance Benefits (hereinafter "DIB"), and on August 24, 2011 an application for Supplemental Security Income (hereinafter "SSI"), alleging that he became disabled on November 30, 2006.[1]   [*Doc. 18-13* at 2-8 and 9-17, respectively].   Plaintiff claims that he became disabled due to a combination of mental and physical impairments, including back, groin, right leg, and right hip pain; inguinal hernia; high blood pressure; very severe depression with psychotic features; and PTSD.   [*Doc. 18-9* at 26]. Each application was denied at the initial level on December 21, 2011 (*Doc. 18-11* at 2 and 3-6, respectively), and at the reconsideration level on May 8, 2012 (*id.* at 10-11 and 12-15, respectively).   Pursuant to Plaintiff's request (*Doc. 18-11* at 16-17), Administrative Law Judge Sherrill A. LaPrade Carvalho (hereinafter "ALJ") conducted a hearing in Dallas, Texas on June 10, 2013.   [*Doc. 18-9* at 23-48].   At the hearing, Plaintiff was present, represented by attorney Erin M. Steffy, and testified (*id.* at 25, 27-43).   Vocational Expert Susan M. Brooks (hereinafter "VE") was also present and testified (*id.* at 25, 43-47).

On July 19, 2013, the ALJ issued her decision, finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled through the date of the decision.   [*Doc. 18-9* at 2-17].   Plaintiff requested that the Appeals Council review the ALJ's decision (*Doc. 18-8* at 33), and his request was denied on August 14, 2014 (*Doc. 18-3* at 2-8), which was the final decision of the Commissioner.   On October 15, 2014, Plaintiff filed his complaint in this case. [*Doc. 1*].

---

[1] On April 16, 2013, Plaintiff amended his disability onset date to June 25, 2010, the date of one of his on-the-job accidents.   [*Doc. 18-11* at 57].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). Courts should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted). While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted). "The possibility of drawing two inconsistent conclusions from the evidence

does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084  (10th Cir. 2007)  (citing *Zoltanski v.  F.A.A.*,  372 F.3d 1195, 1200 (10th Cir. 2004)).

## III. Applicable Law and Sequential Evaluation Process

For purposes of DIB and SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim.   20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) either meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his "past relevant work."   20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

# IV.   Plaintiff's Age, Education, Work Experience,
## and Medical History; and the ALJ's Decision

Plaintiff was born on November 23, 1960.   [*Doc. 18-9* at 28].   Plaintiff claimed to have past relevant work as a truck driver, maintenance engineer, stock room clerk, and product handler. [*Doc. 18-14 at* 27].   Plaintiff was injured on the job in April 2006, when his leg gave way. [*Doc. 18-19* at 73].   From that injury, Plaintiff was treated for right leg calf pain that was diagnosed as a ruptured calf muscle.   *Id.*   He ultimately returned to work and, in June 2010, was again injured on the job when he attempted to lift a heavy cabinet.   Plaintiff now asserts that he is unable to work because of pain in his back, groin, hip, and leg; an inguinal hernia; high blood pressure; severe depression; and PTSD.   [*Doc. 18-9.* at 26].   Plaintiff's medical records include: Office treatment records from Bruce E. Wardlay, D.O. (*Doc. 18-17* at 3-63) and Lake June Medical (*Doc. 18-18* at 2-71 and *Doc. 18-19* at 2-63); Medical Source Statement from Winfred J. Snell, F.N.P. (*Doc. 18-27* at 31-37); Physical RFC Assessment by Laurence Ligon, M.D. (*Doc. 18-19* at 64-71); Consultative Examination from Tamika Perry, D.O., P.A.[2] (*id.* at 72-75); Consultative   Examination   Report   from   Christopher G.   Bellah, Ph.D.   (*Doc. 18-20*   at 2-9); Psychiatric Review Technique (*id.* at 10-23) and Mental RFC assessment (*id.* at 32-35) from Cate Miller, M.D.; Physical RFC Assessment by Shabnam Rehman, M.D. (*id.* at 24-31); and medical records from Parkland Hospital COPC Clinic (*Doc. 18-21* at 2-25 and *Doc. 18-22* at 2-4), LifeNet

---

[2]  This report, exhibit 5F at the hearing, is listed in the transcript as a consultative examination from Cassie Provenzale, P.A.-C.   [*Doc. 18-2* at 3].   Although the examination was clearly done by Tamika Perry, the report bears the electronic signature of Ms. Provenzale at the end, followed by the handwritten signature of Dr. Perry.   [*Doc. 18-19* at 74].   Thus, the inclusion of Ms. Provenzale's electronic signature appears to have been inadvertent.

Community Behavioral Center (*Doc. 18-25* at 2-14; *Doc. 18-27* at 19-30, 38-49; *Doc. 18-30* at 45-57; and *Doc. 18-31* at 2-19), and Bluitt Flowers Health Center (*Doc. 18-26* at 2-59; *Doc. 18-27* at 2-18; *Doc. 18-28* at 2-42; *Doc. 18-29* at 2-37; and *Doc. 18-30* at 2-44).   Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process the ALJ found that Plaintiff has not engaged in substantial gainful activity since his amended alleged disability onset date of June 25, 2010. [*Doc. 18-9* at 7].   At step two, the ALJ found that Plaintiff has the following severe medically determinable impairments:   minimal degenerative changes within the lumbar spine with borderline canal stenosis at L4-5; mild degenerative changes and possible labral tear of the right hip; obesity; and major depressive disorder.   *Id.*.   At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. § 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926), noting that, "[p]articularly, the severity of the [Plaintiff]'s major depression does not meet or medically equal the criteria of Listing 12.04, *Affective Disorders*."   *Id*. at 8.   In making this determination, the ALJ also found that Plaintiff has mild restrictions of his activities of daily living (hereinafter "ADL"); mild difficulties with social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and Plaintiff has had no episodes of decompensation of extended duration.   *Id.*   The ALJ therefore concluded that Plaintiff had not satisfied either the Paragraph B or Paragraph C criteria.   *Id.*

Before step four, the ALJ determined that Plaintiff had the RFC to "lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and push and/or pull in the amount of weight

given.   The [Plaintiff] can occasionally push and pull with the bilateral lower extremities, occasionally balance, stoop, kneel, crouch and crawl, and occasionally climb ramps and stairs, but must avoid climbing ladders, ropes and scaffolds.   He can perform detailed but not complex tasks."   [*Doc. 18-9* at 9].   In support of the RFC finding, the ALJ found that "the [Plaintiff]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms."   *Id.* at 15.   However, the ALJ found that Plaintiff's statements regarding chronic and disabling pain were "disproportionate and even exaggerated," and Plaintiff was therefore "considered less than fully credible."   *Id.*   At the fourth step, the ALJ found that Plaintiff is unable to perform any of his past relevant work, as his previous work had been described by the VE as medium, heavy, or very heavy in exertion, which would be precluded by Plaintiff's current RFC allowing only for a limited range of light work.   *Id.* at 15-16.

At the fifth and final step, the ALJ noted that Plaintiff was born on November 23, 1960 and was 52 years old at the time of the hearing, which made Plaintiff "an individual closely approaching advanced age (20 CFR 404.1563 and 416.963)."   [*Doc. 18-9* at 16].   The ALJ noted that Plaintiff has the equivalent of a high school education, is able to communicate in English, and that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is 'not disabled' whether or not the claimant has transferable job skills."   *Id.* (citing Soc. Sec. Rep. 82-41 and 20 C.F.R. § 404, Subpt. P, Appx. 2).   The ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform.   *Id.*   The ALJ stated that she asked the VE "whether jobs exist in the national economy for an individual with the [Plaintiff]'s age, education, work experience, and

[RFC]," and the VE testified that such an individual "would be able to perform the requirements of the following representative unskilled, light jobs": cashier II, mail clerk, and office clerk/order caller.  *Id.* at 16-17.  The ALJ stated that she "ha[d] determined that the [VE]'s testimony is consistent with the information contained in the Dictionary of Occupational Titles" (*id.* at 17), and concluded that "[Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  *Id.*  The ALJ, therefore, determined that Plaintiff was not disabled within the meaning of the Social Security Act.  *Id.*

## V.   Analysis

Plaintiff makes the following arguments in his brief in support of remand: (1) the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence because it does not account for medical evidence that would require a sit/stand limitation on any work activity, fails to account for all aspects of each medical source's opinions, and fails to properly assess Plaintiff's credibility; and (2) the ALJ failed to properly evaluate the opinions of Plaintiff's treating nurse practitioner, Winfred Snell, FNP.  [*Doc. 22* at 2].  In response, Defendant contends that the ALJ's decision is supported by substantial evidence, and must therefore be affirmed (*Doc. 26* at 4); that the ALJ properly evaluated the Plaintiff's credibility, and gave valid reasons for discrediting it (*id.* at 6); and that the ALJ properly evaluated the medical evidence (*id.* at 9-15).

## A.   The ALJ's RFC Determination

Plaintiff first contends that the ALJ's RFC for Plaintiff, particularly with respect to the stated lifting requirements and protracted periods of standing and walking necessary to light work, is not supported by substantial evidence.  Specifically, Plaintiff contends that the medical and other evidence establishes that Plaintiff is unable to perform "light work," and should have been

assessed capable of only "sedentary work," which is characterized by primarily seated work tasks and occasional lifting of up to 10 pounds.   [*Doc. 22* at 3].   The significance of this difference is more than just physical, as the medical-vocational guidelines ("grids") direct that a claimant of Plaintiff's age, with only a high school education, and past work that is skilled or semi-skilled, whose RFC allows only for sedentary work is "disabled."   20 C.F.R. § 404, Subpt. P, Appx. 2, ¶201.14.   Thus, "[w]hen such individuals [who are restricted to sedentary work] have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains."   *Id*. at ¶201.00(g).   *See also Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998) (grids applied conclusively only if claimant's characteristics precisely match grid criteria) (citations omitted).

    The ALJ must base the RFC assessment on all of the relevant evidence in the record, such as medical history, laboratory findings, effects of treatment and symptoms, including pain, reports of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work evaluations, if any. Soc. Sec. Rep. 96-8p at *5.   "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."   *Id*. at *7.   The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC assessment must always consider and address medical source opinions.   *Id*.   Because the ALJ must consider the whole record, he is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to his position while ignoring other evidence."   *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008)

(citation and internal quotation marks omitted).   When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions.   *Hamlin*, 365 F.3d at 1215 (citation omitted).

Although the ALJ did provide a fairly detailed narrative of Plaintiff's medical history, this Court does not deem it fully compliant with the above-stated requirements of RFC determinations. First, the ALJ's discussion of each medical source exhibit is somewhat cursory and sprinkled with conclusions for which no specific basis is stated.   In addition, while the ALJ gave "greater weight" to certain reports, she failed to describe how possible distinguishing facts might have affected those opinions, such as the purpose for which a report was made or the time period in which the examinations took place.   The ALJ also was dismissive with respect to most reports of Plaintiff's mental impairments and, with respect to her determination of Plaintiff's credibility, the ALJ relied both on inaccurate facts and supposed "inconsistencies" in Plaintiff's statements to various medical sources that were taken out of context and do not necessarily indicate lack of credibility.   Significantly, as the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, she admits that her decision was based largely on her assessment of Plaintiff's credibility regarding intensity, persistence, and limiting effects of his symptoms.   *See* [*Doc. 18-9* at 9].   In this regard, the ALJ stated that "[Plaintiff]'s statements concerning the intensity, persistence and limiting effects of [his] symptoms are considered credible only to the extent they are consistent with the findings of this decision for the reasons already explained."   [*Id*. at 15].   This statement is so vague as to be essentially meaningless.   However, the ALJ added that "[Plaintiff] has not taken prescription narcotics for pain control, has not received physical therapy since early 2011, declined to undergo

epidural steroid injections although they were recommended, and has never been referred for chronic pain management or neurosurgical consultation," concluding that, "these facts do not support the presence of disabling pain." *Id*. The ALJ also found that "despite the abnormal findings on MRI and the claimant's impaired ability to ambulate, his [ADL] do not corroborate his alleged inability to sit, stand and walk for prolonged periods or his assertions of chronic and disabling pain," which the ALJ deemed "disproportionate and even exaggerated" in finding Plaintiff to be "less than fully credible." *Id*.

Although credibility is "peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence," it is also the case that credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (citations and internal quotation marks omitted).   Here, as in *Kepler*, the link between the ALJ's determination that Plaintiff was not credible and the evidence in support of such determination is missing, leaving this Court with nothing but a conclusion.   As even Defendant admits, at least some of the ALJ's statements regarding Plaintiff's credibility are not accurate.   *See* [*Doc. 26* at 8] They are also too superficial, and too incomplete, to constitute an adequate basis for the denial of disability.   First, the statements about Plaintiff's medication and physical therapy are inaccurate. In December 2012, Plaintiff was prescribed Tramadol, a narcotic substitute, for back and hip pain by Arjumand Ghayas, M.D, who also referred him to physical therapy.   [*Doc. 18-27* at 10-12]. Plaintiff then was in physical therapy between January and March of 2013.   *Id*. at 12-16. Additionally, Evelyn Parker-Gaspard, Ph.D. noted in November 2012 that Plaintiff was then living in his car, and had reported that he would be unable to continue getting his medications unless he

moved to a shelter.   *Id*. at 6.   Regarding epidural injections, the fact that they were recommended is actually consistent with Plaintiff's claims of pain intensity, and Plaintiff testified that the reasons he did not get the injections were that his "back was just too tender" (*Doc. 18-9* at 28), he was "scared to" because he thought the injections had made people sick, and that his doctor had told him the injections were only a short term fix.   *Id*. at 28-29.   Plaintiff further testified that the doctors at Lake June Medical Center had not wanted to treat him further because he had used up his medical benefits.   *Id*. at 42.   Finally, although Plaintiff was not specifically "referred" to a chronic pain management program, he was evaluated many times for his chronic pain issues and Francisco J. Batlle, M.D. specifically recommended, on October 5, 2010, that Plaintiff would benefit from a "[c]hronic pain management therapy program if [his] symptomology does not abate."   [*Doc. 18-19* at 11].   In any event, inability to pay for them can justify a claimant's failure to pursue recommended medical treatment, and "the ALJ is ordinarily required to address such financial considerations before drawing adverse inferences from the claimant's failure to seek or pursue treatment."   *Alarid v. Colvin*, 590 F. App'x 789, 793 (10th Cir. 2014) (citing Soc. Sec. Rep. 96–7p, 1996 WL 374186, at *7-*8 (1996)).   Although Plaintiff was still living in his car at the time of the hearing, the ALJ did not discuss whether, or how, Plaintiff's financial situation had impacted his ability to obtain prescriptions or medical treatment.

The ALJ's decision also notes that, after Plaintiff's August 2010 injury, he did not seek emergency room treatment, or other immediate medical attention, concluding from those facts that his claim of "immediate onset of severe low back and right inguinal pain after his injury is not borne out by the evidence."   [*Doc. 18-9* at 10].   However, in a behavioral medicine consultation in February 2011, it is noted that Plaintiff "felt and heard a pop in his low back and groin area

[during the 2010 injury].   Even though he was in pain he continued to complete his task. [Plaintiff] relates that he reported the incident to the supervisor *and he was sent to the company doctor at Con[c]entra on 06/28/10.*"   [*Doc. 18-19* at 19] (emphasis added).   Thus, this report, which was not discussed at all by the ALJ, suggests that it was Plaintiff's employer that determined when he received treatment, rather than Plaintiff himself.

It appears that every medical source that examined or treated Plaintiff since his 2010 work accident confirmed the existence of low back, leg, hip, and groin pain.   For example, Thomas P. Leonard, M.D., who examined Plaintiff in both October 2010 and February 2011 for worker's compensation purposes, noted that Plaintiff had "rather marked tenderness in the lumbosacral spine area with muscle spasm.   The [Plaintiff] does have some restriction of range of motion due to pain, both in flexion and extension.   There is marked tenderness in the right groin area." [*Doc. 18-18* at 61]   Likewise, Tamika L. Perry, D.O., P.A., who examined Plaintiff in April 2012, noted that Plaintiff's "current symptoms include R anterior hip and groin pain as well as low back pain.   He rates this pain as intermittent and 8/10.   He also admits R calf constant burning pain that is 10/10.   Associated symptoms include spasms of his R hip musculature.   He is able to walk 10 yards and can sit for 20-30 min[ute]s before pain causes him to stop."   [*Doc. 18-19* at 73].   In December 2012, Arjumand Ghayas, M.D., a doctor at Parkland Health & Hospital System (whose records were essentially universally rejected by the ALJ),[3] noted that Plaintiff, who was taking

---

[3] After first "concur[ring] in large part with the May 2012 opinions of "the state agency medical consultants," the ALJ noted that Plaintiff "received further treatment for his physical impairments in the Parkland Health and Hospital system, and for his mental impairments from Lifenet," then broadly rejected the evidence provided by those two entities, stating that "[n]one of this new evidence is sufficiently persuasive to significantly alter the functional limitations imposed by the state agency doctors, however."   [*Doc. 18-9* at 12].   The ALJ then briefly discussed some of the Continued...

Tramadol for back and hip pain, along with other prescription medications, was "positive for" both neck and back pain.   [*Doc. 18-27* at 10-11].   Thus, Plaintiff consistently complained of severe pain for at least three years prior to the June 2013 hearing.   Even more significantly, there appears to be no indication in the extensive transcript that any of the numerous medical sources who submitted records or reports considered Plaintiff to be deceptive or exaggerating regarding his pain.[4]

With respect to Plaintiff's ADL, the ALJ did not specify any particular activities that Plaintiff engaged in that "do not corroborate" his claims of functional disability.   However, she noted that, during an April 2012 mental evaluation by Christopher G. Bellah, Ph.D., Plaintiff indicated that he "was capable of bathing, grooming, doing laundry, cooking, doing chores, and running errands without assistance."   [*Doc. 18-9* at 12].   No further details were given, making it difficult to evaluate what either Plaintiff or Dr. Bellah may have meant by these statements. Certainly, there is a wide range of difficulty associated with such activities, as well as a wide range of capacity to perform them.   The ALJ also appears to have relied heavily on the fact that Plaintiff frequently did not use his cane at medical examinations, stating that "the [Plaintiff] neither used nor required a cane on the great majority of examinations," and concluding that, therefore, his allegations regarding cane usage were "less than credible."   *Id*. at 15.   Again, however, a

---

Parkland (including Bluitt Flowers) and LifeNet records, focusing on how those records were supportive of her RFC findings.

[4] One possible exception is Dr. Rehman who, in response to a question regarding whether the severity of Plaintiff's symptoms and their claimed effect on function was consistent with all medical and non-medical evidence, stated that Plaintiff's "[l]imitations [are] not fully supported by the [medical evidence of record], MER, and other evidence."   [*Doc. 18-20* at 29].   However, a claimant's subjective reports of pain "may not be disregarded solely because no objective evidence exists to support such claims."   *See Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

claimant who "requires a cane" is not necessarily unable to walk short distances without one and, at every examination, it was noted that Plaintiff walked with a noticeable limp ("antalgic gait"). *See, e.g.*, [*Doc. 18-18* at 60].   Nor does need of a cane preclude the ability to drive, as implied in the ALJ's decision.   [*Doc. 18-9* at 11].   In any event, "the ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain," and "sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity."   *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (citations and internal quotation marks omitted).   Moreover, "[p]ain, even if not disabling, is still a nonexertional impairment to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's pain is insignificant."   *Id*. at 1490-91 (citations omitted).

Here, the ALJ essentially disregarded Plaintiff's claims of pain based almost entirely on non-specific daily activities he reportedly could perform, the facts that he does not "always" use his cane to ambulate, that he can drive, and once unsuccessfully attempted to push his disabled vehicle to the side of the road.[5]   The ALJ also cited to functionality statements made by select medical sources as belying Plaintiff's claim of disabling pain.   One such opinion, by Dr. Perry, stated that Plaintiff "demonstrates the ability to perform the following work activities: sit, stand, move about for limited periods of time, lift/carry objects ‹20 pounds, hear, and speak." [*Doc. 18-19* at 74].   However, Dr. Perry did not discuss what she considered to be "limited periods of time," and Plaintiff had reported to her that he could only walk 10 yards and only sit for 20-30 minutes.   *Id*. at 73.   Despite relying, at least to some extent, on Dr. Perry's limited report,

---

[5] Plaintiff made no effort to hide his activities from either the medical sources or the ALJ, although it would not have been difficult for him to do so.   He also testified that, although he "thought [he] could move" his vehicle, in fact, "it shut [him] down."   [*Doc. 18-9* at 41].

15

the ALJ determined that Plaintiff could stand and/or walk for up to 6 hours in an 8 hour workday, and could similarly sit for that amount of time as well, based on the consultative opinion of Dr. Rehman in May 2012.   [*Doc. 18-9* at 9].   The ALJ did not, however, discuss the apparent conflict between these findings and Dr. Perry's opinions.

> [T]he absence of an objective medical basis for the degree of severity of pain may affect the weight to be given to the claimant's subjective allegations of pain, but a lack of objective corroboration of the pain's severity cannot justify disregarding those allegations. By requiring consideration of evidence other than objective medical data, Congress recognized that the severity of pain is inherently subjective. A relatively expansive interpretation of 'consistent' or 'reasonably expected' is the only logical reading of [42 U.S.C. § 423(d)(5)(A)], because a more restrictive reading would render meaningless that part of it requiring consideration of all evidence. If objective medical evidence must establish that severe pain exists, subjective testimony serves no purpose at all.   A proper reading of the statute appropriately recognizes that two patients with the same impairment may be affected to totally differing degrees.

*Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987).   The ALJ's conclusion that Plaintiff's subjective reports of pain were not credible were not "closely and affirmatively linked to substantial evidence" and, indeed, appears to be contradicted by much of the same medical evidence upon which the ALJ based her RFC determination. This is legal error, and requires remand for additional consideration of the credibility issue.

### B.   The ALJ's Consideration of the Opinions of Non-Acceptable Sources

Plaintiff also contends that the ALJ failed to properly evaluate the opinions of Plaintiff's treating nurse practitioner, Winfred Snell, in determining Plaintiff's RFC.   [*Doc. 22* at 9-13].   As already noted, the ALJ must base the RFC assessment on all of the relevant evidence in the record, and must include a narrative discussion describing how the evidence supports each conclusion. Soc. Sec. Rep. 96-8p at *5-7.   The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC

assessment must always consider and address medical source opinions.  *Id*.  Because the ALJ

must consider the whole record, he is prohibited from picking and choosing "among medical

reports, using portions of evidence favorable to his position while ignoring other evidence."

*Carpenter*, 537 F.3d at 1265 (citation and internal quotation marks omitted).  When there are

multiple opinions regarding medical severity and functional ability from different sources, the ALJ

must explain the weight given to each source's opinions.  *Hamlin*, 365 F.3d at 1215 (citation

omitted).

      Here, the ALJ at least briefly discussed the opinions of more than a dozen medical sources.

First, she notes that, in February 2007, Plaintiff was given a "whole person impairment of only 6%

(for workers' compensation purposes)."  [*Doc. 18-9* at 10].  The ALJ noted that this rating

followed a work-related injury to the right lower extremity.  *Id*.  However, the author of the

referenced report, Ronald J. Washington, M.D., noted both a leg injury and "a painful traumatic

right hip derangement." [6]  With respect to the hip injury, Dr. Washington opined that

"[e]ventually, this type of condition will progress beyond a shadow of a doubt," particularly

"considering [Plaintiff's] residual gait derang[e]ment."  [*Doc. 18-25* at 16 and 18].

Dr. Washington also opined that, due to Plaintiff's age (then 46), "his hip condition may

_____

[6] Dr. Washington indicated that the date of Plaintiff's injury was November 30, 2006.
[*Doc. 18-25* at 16]   The existence of two separate work-related injuries in 2006 is consistent with
Dr. Perry's April 2012 report, in which she states that Plaintiff injured his right calf muscle in
April 2006, returned to work and, when moving a heavy object "felt his R hip 'shift' and felt
sudden, sharp pain."  [*Doc. 18-19* at 73].  Plaintiff again returned to work, but last worked on
June 25, 2010, when he was again injured while attempting to move a heavy object and felt a
sudden pain in his right groin and later his lower lumbar spine."  [*Doc. 18-18* at 13].  It does not
appear that the ALJ considered the second accident, as she only refers to the initial calf injury and
the final back/groin injury.  *See* [*Doc. 18-9* at 9-10].

eventually result in a total hip replacement." *Id.* at 17.   These opinions were not discussed by the ALJ, although they do support Plaintiff's claims of continuing (or even worsening) pain.

The ALJ next briefly discussed Plaintiff's treatment at Lake June Medical Center, focusing primarily on Plaintiff's "delay" in seeking treatment of his 2010 injury and the findings of an MRI. Although Plaintiff was treated for some period of time by Bruce Wardlay, D.O. at Lake June, no assignment of weight was given by the ALJ to his opinions.   Similarly, the ALJ assigned no specific weight to the opinions of Thomas P. Leonard, M.D., who examined Plaintiff in October 2010 and February 2011 for worker's compensation purposes, although she did rely on his opinions that, as of February 2011, Plaintiff had a 5% whole person impairment and was capable of returning to "light duty."   *See* [*Doc. 18-9* at 10-11].   Thus, the ALJ gave greater weight to Dr. Leonard's February 2011 statement that Plaintiff "could return to light duty"[7] (*Doc. 18-Ex3F*), than to the April 2013 medical source statement provided by Plaintiff's treating nurse practitioner, Winfred J. Snell, giving as her only reason that "because Ms. [sic] Snell is not an acceptable medical source within the meaning of the Social Security Act and Regulations, the undersigned accords little weight to her [sic] opinion."   [*Doc. 18-9* at 15].   However, the fact that

---

[7] Given that Dr. Leonard, among others, was assessing Plaintiff for Texas worker's compensation eligibility, it would have been appropriate for the ALJ to discuss how that agency interprets the term "light duty," and how that interpretation compares to the definition of "light work" in C.F.R. §§ 404.1567(b) and 416.967(b).   It does not appear that the Texas Worker's Compensation Act, or its attendant regulations, provides a definition of "light duty."   *See* Tex. Labor Code Ann. §§ 401.001, *et. seq.* (1993).   It is notable, however, that Dr. Leonard effectively opined that Plaintiff could return to his old job as a mover, but only to perform light duty.   However, the VE at the social security disability hearing specifically ruled out all of Plaintiff's former jobs because they all were "medium, heavy, or very heavy in exertion and would be precluded by his current [RFC]."   [*Doc. 18-9* at 16].   As such, Dr. Leonard's opinion that Plaintiff was fit for "light duty" in early 2011 was essentially meaningless, as Plaintiff's job did not involve "light duty" within the scope of the Social Security Act.

one medical source is a medical doctor, while the other is a nurse practitioner, is not a valid reason, standing alone, to give greater weight to the former.  *See, e.g., Fulton v. Colvin*, No. 15-6054, 2015 WL 6847808, at *3-4 (10th Cir. Nov. 9, 2015) (although factors set forth in §§404.1527(c) and 416.927(c) are applicable only to evaluation of acceptable medical sources, they "represent basic principles that apply to consideration of all opinions from medical sources who are not acceptable medical sources," and an ALJ's weighting of not acceptable medical sources is sufficient if it permits the reviewing court to "follow the adjudicator's reasoning") (citations and internal quotation marks omitted).  *See also* Soc. Sec. Rep. 06-03p, 2006 WL 2329939 (August 9, 2006) ("Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case").

Here, the ALJ ignored the facts that Mr. Snell had actually treated Plaintiff since at least September 2012 (*Doc. 18-26* at 56) before filling out his April 2013 "Lumbar Spine Questionnaire" (*Doc. 18-27* at 32-36), in which he opined, among other things, that Plaintiff's prognosis relating to a bulging lumbar disc and right hip anterior labral tear was "fair to poor," that Plaintiff had an abnormal gait and walked with a limp using a cane, had decreased range of motion at lumbar spine and right hip, could walk only one city block without rest, could sit for only ten minutes at a time, could stand for only 15 minutes at a time, could sit, stand, or walk less than two hours in an eight-hour workday, required a job that would permit him to shift positions at will from

sitting, standing or walking, that his right leg should be elevated to waist level for 30% of a sedentary work day, that he "should avoid lifting" any weight, that he should not twist, bend, crouch, or climb stairs or ladders, and that he would likely miss work about twice a month, "dependent on job scope and limitation." *Id.* All of these opinions, the majority of which the ALJ did not mention, were granted "little weight" simply because Mr. Snell was a nurse practitioner rather than an "acceptable medical source."

In fact, the ALJ's decision is remarkably silent regarding the particular weight given to any of the medical sources, acceptable or not. For example, the ALJ did not specify what weight she gave to the opinions of Drs. Washington, Wardlay, Leonard, or Perry, among others. Regarding Drs. Rehman and Miller, whom the ALJ calls "the state agency medical consultants," the ALJ stated that she "concurs, in large part, with the conclusion" reached by them in May 2012.[8] After first indicating that none of the subsequent evidence provided by Parkland or LifeNet "was sufficiently persuasive to significantly alter the functional limitations imposed by the state agency doctors," the ALJ did give "greater weight" to the opinions of Drs. Parker-Gaspard (a Parkland Ph.D.), Bellah, and Miller regarding Plaintiff's mental functionality, than she gave to Meredith Holmes, R.N., A.P.N. [*Doc. 18-9* at 14]. The ALJ clearly relied on her own interpretation that Dr. Parker-Gaspard's examination of Plaintiff on November 12, 2012 "was essentially normal" (*see Doc. 18-9* at 14) and the fact that Dr. Miller had assigned him a Global Assessment of Functioning (hereinafter "GAF")[9] score of 55 approximately six months earlier (*Doc. 18-20*

---

[8] It appears that the conclusion with which the ALJ concurred in part was that Plaintiff was capable of simple, unskilled "light work." [*Doc. 18-9* at 12].

[9] The GAF score is a measurement of the clinician's judgment of an individual's psychological, Continued...

at 22), whereas Ms. Holmes' assessment of Plaintiff's GAF score was 40.   [*Doc. 18-25* at 7].

However, even Dr. Parker-Gaspard, in what appears to be her first assessment of Plaintiff on

September 26, 2012, indicated that Plaintiff's evaluative score of 24 indicated that his depression

fell within the "severe depression" range, which applies to scores of 15+, and that his anxiety score

of 21 also indicated "severe anxiety."   [*Doc. 18-27* at 2].   Moreover, Dr. Parker-Gaspard also

noted that the "[s]everity, chronicity, and number of [Plaintiff's mental] symptoms indicate

referral to specialty agency."   *Id.*   Apparently, Dr. Parker-Gaspard's opinion of Plaintiff's mental

functioning became that it was "essentially normal" less than two months later.   This discrepancy

was also not discussed by the ALJ.

The ALJ's narrative is vague with respect to the weight given to medical opinions,

overlooks some opinions, or parts thereof, entirely, and does not generally tie her conclusions to

the evidence.   The narrative therefore leaves this Court without the ability to effectively evaluate

her decision.

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be

remanded for proper consideration of:   (1) an appropriate RFC assessment of the Plaintiff,

---

social and occupational functioning, and should not include impairment in functioning due to
physical or environmental limitations.   DSM-IV-TR at 32.   A GAF score within the range of
51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumlocutory speech, occasional
panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few
friends, conflicts with peers or co-workers)."   *Id.* at 34.   A GAF score of 31-40 indicates "[s]ome
impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or
irrelevant) *or* major impairment in several areas, such as work or school, family relations,
judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to
work)."   *Id.*

including appropriate consideration of his credibility, that complies with applicable legal requirements, as set forth above; and (2) the opinions of Winfred Snell, FNP, in compliance with applicable legal requirements, as set forth above.

      **IT IS THEREFORE ORDERED** that Plaintiff's ***Motion for Reversal and Remand for Further Proceedings*** *(Doc. 21)* is **GRANTED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.   A final order will be entered concurrently with this Memorandum Opinion and Order.

      **IT IS SO ORDERED.**

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**